UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 19-21761-CIV-DIMITROULEAS

MICHAEL PARIS, as Personal Representative
of the Estate of HENRY PARIS, JR., deceased,
CHRISTIE HEGEL, and ROLANDO
HERNANDEZ, individually and on behalf of
all others similarly situated,

    Plaintiffs,

v.

PROGRESSIVE AMERICAN INSURANCE
COMPANY and PROGRESSIVE SELECT
INSURANCE COMPANY,

    Defendants.
_____/

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

THIS MATTER comes before the Court on Defendants Progressive American Insurance Company ("Progressive American") and Progressive Select Insurance Company ("Progressive Select") (collectively "Defendants" or "Progressive")'s Motion for Summary Judgment [DE 171] ("Progressive's Motion") and Plaintiffs Christie Hegel ("Hegel") Rolando Hernandez ("Hernandez"), and Michael Paris ("Paris")'s Motion for Summary Judgment on Liability and Measure of Damages [DE 179] ("Plaintiffs' Motion"). The Court has reviewed Progressive's Motion and Plaintiffs' Motion, the Responses [DE 201, 193] and Replies [DE 215, 218] thereto, the statements of undisputed material facts [DE 172, 181, 194, 199, 213], the Notices of Supplemental Authority [DE 225, 230, 235],[1] and the Parties' oral arguments at the March 26, 2021 hearing held on this matter. The Court is otherwise fully advised in the premises.

---

[1] The Parties Motions were filed in redacted form as well as unredacted form under seal. In this Order the Court refers to the redacted, unsealed versions of various documents.

I.      BACKGROUND

Plaintiffs Michael Paris ("Paris"), Christine Hegel ("Hegel"), and Rolando Hernandez ("Hernandez") (collectively "Plaintiffs") filed this class action against Defendants Progressive American Insurance Company ("Progressive American") and Progressive Select Insurance Company ("Progressive Select") (collectively "Defendants" or "Progressive") for purportedly systemically underpaying Plaintiffs in settling their total loss insurance claims. The Court previously certified this matter for class treatment. Now, Plaintiffs and Defendants both move for summary judgment.

During the relevant time period, Plaintiffs, and similarly situated insureds, possessed automobile insurance coverage from Progressive under insurance policies (the "Policy") with materially similar provisions.[2] PSMF ¶ 5 [DE 181]; DRSMF ¶ 5 [DE 194].[3] In the relevant portion of the Policy, Part IV, the Policy provides coverage for "sudden, direct, and accidental loss to a covered auto…." DSMF ¶ 39 [DE 172]; PRSMF ¶ 39 [DE 199]. This coverage is limited by the relevant limit of liability, which the Policy states is the lowest of " a. the actual cash value of the stolen or damaged property at the time of the loss reduced by the applicable deductible; b. the amount necessary to replace the stolen or damaged property reduced by the applicable deductible;…." DSMF ¶ 39; PRSMF ¶ 39. The Policy specifies that the "actual cash value is determined by the market value, age, and condition of the vehicle at the time the loss occurs." DSMF ¶ 40; PRSMF ¶ 40.

---

[2] The Policy is filed in the record as Exhibit A to Plaintiffs' statement of material facts in support of their motion for summary judgment. Exh. A [DE 181-1].

[3] Defendant's statement of material facts, Plaintiff's responsive statement of material facts, Plaintiff's statement of material facts and Defendant's responsive statement include various citations to portions of the record. Any citations herein to the statement of facts or the responses thereto should be construed as incorporating those citations to the record. Defendant's statement of facts [DE 172] is cited as "DSMF", Plaintiff's response [DE 199] is cited as "PRSMF", Plaintiffs' statement of material facts [DE 181] is cited as PSMF and Defendant's response [DE 194] is cited as "DRSMF."

When a vehicle insured by Progressive is involved in an accident and the cost to repair the covered auto is greater than its pre-accident value, less estimated net salvage proceeds, Progressive deems the vehicle a "total loss". PSMF ¶ 18; DRSMF ¶ 18. Plaintiffs in this matter were insured under Progressive Policies when they or their vehicles were involved in automobile accidents. DSMF ¶¶ 1, 3, 12, 14, 22, 25. Progressive determined that each of the vehicles involved in the accidents were total losses. DSMF ¶¶ 4, 15, 27. In evaluating Plaintiff Paris's claim, Progressive determined the base value of the vehicle to be $6,324.94; Progressive then subtracted a $127.26 condition adjustment, added $421.86 in sales tax, subtracted a $500 deductible and issued a payment of $6,149.54. PSMF ¶ 42, 43, DRSMF ¶ 42, 43. In settling Plaintiff Hegel's claim, Progressive determined the base value of the vehicle to be $ 33,080.96; Progressive then added a $320 adjustment, added $156.48 in sales tax, subtracted a $500 deductible and calculated a final total settlement amount of $33,057.44. PSMF ¶¶ 48, 49; DRSMF ¶¶ 48, 49. In settling Plaintiff Hernandez's claim, Progressive determined the based value of the vehicle to be $40,960.08; Progressive then added a $40.65 condition adjustment, added a $400.00 after-market parts adjustment, added $142.56 in sales tax, subtracted a $500.00 deductible and calculated a total settlement amount of $41,043.29. PSMF ¶¶ 59, 60; DRSMF ¶¶ 59, 60.

Defendants do not pay full sales tax for all insureds on the value of the covered auto and do not pay any title or transfer fees as part of total loss settlements. As to sales tax, Defendants pay different amounts based on whether the vehicle is owned or leased and whether the vehicle owner retains salvage. DSMF ¶ 41–44; PRSMF ¶ 41–44. If the vehicle is owned, the Defendants pay a full 6% sales tax (plus local surtax) on the adjusted value of the total loss vehicle as part of the total loss settlement. DSMF ¶ 42; PRSMF ¶ 42. If the vehicle is leased, the Defendants pay

only the sales tax incurred by the lessee through the lease up through the time of loss. DSMF ¶ 43; PRSMF ¶ 43.  If the insured retains the salvaged vehicle, Defendants pay no sales tax. DSMF ¶ 44; PRSMF ¶ 44.  Progressive does not pay a transfer fee on any vehicle as part of the total loss settlement, regardless of it is owned or leased. DSMF ¶ 45; PRSMF ¶ 45.

According to Plaintiffs, Defendants' failure to pay title and transfer fees and the full 6% sales tax as part of the ACV is a violation of the Policy.  As such, Plaintiffs contend that Plaintiffs, and every class member, are owed a uniform title and transfer fees of $78.95 and the full 6% sales tax (plus local surtax) on the adjusted value of the total loss vehicle.

## II.     STANDARD OF REVIEW

Under Rule 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears "the stringent burden of establishing the absence of a genuine issue of material fact." *Suave v. Lamberti*, 597 F. Supp. 2d 1312, 1315 (S.D. Fla. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

"A fact is material for the purposes of summary judgment only if it might affect the outcome of the suit under the governing law." *Kerr v. McDonald's Corp.*, 427 F.3d 947, 951 (11th Cir. 2005) (internal quotations omitted). Furthermore, "[a]n issue [of material fact] is not 'genuine' if it is unsupported by the evidence or is created by evidence that is 'merely colorable' or 'not significantly probative.'" *Flamingo S. Beach I Condo. Ass'n, Inc. v. Selective Ins. Co. of Southeast*, 492 F. App'x 16, 26 (11th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)). "A mere scintilla of evidence in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment; there must be evidence from which a jury could reasonably find for the non-moving party." *Id.* at 26-27 (citing *Anderson*, 477

U.S. at 252). Accordingly, if the moving party shows "that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the nonmoving party" then "it is entitled to summary judgment unless the nonmoving party, in response, comes forward with significant, probative evidence demonstrating the existence of a triable issue of fact." *Rich v. Sec'y, Fla. Dept. of Corr.*, 716 F.3d 525, 530 (11th Cir. 2013) (citation omitted).

"When the only question a court must decide is a question of law, summary judgment may be granted." *Saregama India Ltd. v. Mosley*, 635 F.3d 1284, 1290 (11th Cir.2011). "Contract and statutory interpretation are both questions of law appropriately decided on summary judgment." *Bastian v. United Servs. Auto. Ass'n*, 150 F. Supp. 3d 1284, 1288 (M.D. Fla. 2015).

### III.   DISCUSSION

Plaintiffs contend that Defendants have breached the Policy by failing to pay title and registration fees of $79.85 ("Transfer Fees") and sales tax of 6% (plus applicable local surtax) of the underlying vehicle value ("ACV Sales Tax") on their total loss claims. Plaintiffs contend that Progressive promises to pay for "loss", meaning the cost to repair or replace damage to the covered auto, under the Policy. In the context of total loss claims, however, Plaintiffs invoke the ACV limitation of liability, rather than paying more to repair the total loss vehicle. In turn, Plaintiffs interpret actual cash value ("ACV") under the Policy as equating to replacement cost, including Transfer Fees and ACV Sales Tax, less depreciation.

"A claim for breach of contract under Florida law requires proof of three elements: (1) the existence of a valid contract; (2) a material breach; and (3) damages." *See Richardson v. Progressive Am. Ins. Co.*, No. 218CV715FTM99MRM, 2019 WL 2287955, at *4 (M.D. Fla.

May 29, 2019) (citing *Havens v. Coast Fla., P.A.*, 117 So. 3d 1179, 1181 (Fla. 2d DCA 2013)). When interpreting insurances contracts, under Florida law, the contract is construed according to its "plain meaning." *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1304 (11th Cir. 2008). Ambiguities in insurance contracts should be construed liberally in favor of the insured and against the drafter. *See Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005); *Prudential Prop. & Cas. Ins. Co. v. Swindal*, 622 So. 2d 467, 472 (Fla. 1993). "[A]mbiguity exists in an insurance policy only when its terms make the contract susceptible to different reasonable interpretations…." *Fireman's Fund Ins. Co. v. Tropical Shipping & Const. Co.*, 254 F.3d 987, 1003 (11th Cir. 2001).

As the Court outlines below, Plaintiffs' interpretation of the Policy are reasonable. Accordingly, the Court finds that Defendants have breached the Policy by failing to pay Transfer Fees and ACV Sales Tax when settling total loss claims.

In response to Plaintiffs' claims, Defendants first argue that the Policy does not cover "replacement costs" for the covered auto, but rather only the "sudden, direct, and accidental loss to a … covered auto". Defendants emphasize that its obligation under the Policy is to pay for the "loss" to the covered auto. In the context of total loss claims, when the cost to repair the covered auto is greater than the pre-accident value of the covered auto, Defendants reiterate that they pay for the 'sudden, direct, and accidental loss' to the 'covered auto', subject to any exclusions or limits of liability. DRSMF ¶ 18. Neither Defendants, nor the Policy specify how the "loss" to the covered auto is measured in the context of a total loss claim, but explains that the Policy's limits of liability "clarify how much it will pay for a covered loss…." Def.'s Mot. Sum. J. 14, [DE 171]. For total loss claims, Progressive states it does not pay to repair the vehicle because another, necessarily lesser, limit of liability, either the actual cash value or the amount necessary

to replace the covered auto, limits Progressive's liability. DRSMF ¶ 24 (stating that when the cost to repair a covered auto exceeds the pre-accident value, less estimated net salvage proceeds, "Progressive does not pay repair costs for total loss vehicles; another limit of liability would apply to a total loss.").[4]

In absence of a clear definition of "loss", it is reasonable to interpret the Policy as stating that loss will be determined by the lowest of the Policy's limits of liability as applied to the claim.[5] For total loss claims, where the pre-accident value is always less than the cost to repair the vehicle, the relevant limit of liability then is either the cost to replace the vehicle or the ACV. Here, Plaintiffs are not asking for value more than the ACV; Plaintiffs, in effect, claim Defendants are not properly calculating the ACV in cases where the relevant limit of liability is the ACV. Accordingly, whether Progressive has committed the breach of contract complained of turns on whether the replacement costs such as ACV Sales Tax and Transfer Fees are included in a covered auto's ACV under the Policy. *See Sos v. State Farm Mut. Auto. Ins. Co.*, 396 F. Supp. 3d 1074, 1079 (M.D. Fla. 2019) ("Liability in this case hinges on the meaning of 'actual cash value.' The Policy provides that State Farm has the right to 'pay the *actual cash value* of the covered vehicle minus any applicable deductible.'").

### A. Meaning of Actual Cash Value Under the Policy

---

[4] The Court notes that the Policy specifies a fourth limit of liability, the "stated amount", Policy 39, [DE 181-1]; however, neither party argues that the "stated amount" is the relevant manner in which Progressive measures the loss to the covered auto or limits its liability.

[5] This reading of the Policy is further supported by the Record in this case. The evidence presented the record demonstrates that for total loss claims, Progressive intend to pay the actual cash value of the vehicle. For instance, Progressive stated that "[i]f Progressive determines a vehicle is a total loss, it uses third-party software to determine the actual cash value under the terms of the Policy." DRSMF ¶ 28 [DE 194]. Further, at the hearing on the Parties' cross motions for summary judgment counsel for Progressive stated that when paying premiums under the Policy "what you're paying for is the payment of the actual cash value of the vehicle, which is what Progressive does for both" leased and owned vehicles. Hearing Transcript 30:14–17. Progressive's counsel went on to explain that Progressive only pays sales tax for owned vehicles because it is required under Florida statute.

Plaintiffs argue that actual cash value equates to replacement cost less depreciation under both Florida law and the terms of the Policy.

Defendants, in opposition, contend that replacement costs are not part of the "actual cash value" of a covered auto under the Policy. Progressive's Policy, Defendants believe, is distinguishable from the policies of other insurers in which courts have found ACV was equivalent to replacement costs less depreciation. These other insurers policies, Defendants note, were either silent as to the meaning of ACV or defined "actual cash value" to include replacement costs. For instance, Defendants point to *Roth v. GEICO* and *Joffe v. GEICO* where both the policies defined ACV as "replacement costs" and *Sos v. State Farm Mutual Ins. Co.* which contains no definition or clear description for actual cash value. *See, e.g. Roth v. GEICO Gen. Ins. Co.*, No. 16-62942-CIV, 2018 WL 3412852 (S.D. Fla. June 14, 2018), *vacated*, No. 16-62942-CIV-WPD, 2020 WL 5507208 (S.D. Fla. Aug. 27, 2020); *Joffe v. GEICO Indem. Ins. Co.*, No. 18-61361-CIV, 2019 WL 5078228, at *1 (S.D. Fla. July 31, 2019); *Sos v. State Farm Mut. Auto. Ins. Co.*, 396 F. Supp. 3d 1074 (M.D. Fla. 2019). The Policy in this matter, purportedly unlike the policies in *Roth, Joffe,* and *Sos,* contains a provision which states that "[a]ctual case value is determined by the market value, age, and condition of the vehicle at the time of the loss." Policy, Part IV.2(g), [DE 181-1].

Construing the Policy as a whole, *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000), it is clear that there is more than one reasonable interpretation. Under Florida law, market value is routinely interpreted to mean replacement costs less depreciation. *See Trinidad v. Fla. Peninsula Ins. Co.*, 121 So. 3d 433, 438 (Fla. 2013) ("actual cash value is generally defined as 'fair market value' or '[r]eplacement cost minus normal depreciation,' where depreciation is defined as a 'decline in an asset's value because of use, wear, obsolescence, or age.'"); *Goff v.*

*State Farm Fla. Ins. Co.*, 999 So. 2d 684, 690 (Fla. 2nd DCA 2008). As such, it is reasonable to read an insurance policy which specifies that ACV will be determined by market value, age, and condition, under Florida law, as equating ACV with replacement costs less depreciation. Liberally construing the Policy in favor of the insured, *see Taurus Holdings, Inc. v. U.S. Fid. & Guar. Co.*, 913 So. 2d 528, 532 (Fla. 2005), the Court finds that ACV, determined by market value, age and condition, is equivalent to replacement costs less depreciation, under the Policy.

In *Sos v. State Farm Mut. Auto. Ins. Co.*, a United States District Court for the Middle District of Florida found that under an auto insurance policy which did not contain a definition for ACV, "actual cash value" unambiguously meant replacement costs minus depreciation. *See* 396 F. Supp. 3d at 1080. The present policy may be distinguishable from *Sos* because it contains a clause which states that "actual cash value" will be determined by market value, age, and condition. This provision, if anything, renders the term "actual cash value" ambiguous under the contract. The difference Defendants point to between the contract at issue in the present matter and insurance policy in *Sos*, is that the present policy contains a provision which states: "[p]ayments for loss to a covered auto, non-owned auto, or custom parts or equipment are subject to the following provisions…[t]he actual cash value is determined by the market value, age, and condition of the vehicle at the time the loss occurs." This provision is not a "definition" under the Policy, however. "Actual cash value" is not a "defined term" in the Policy. Defined terms under the Policy are printed in bold type face throughout the Policy and "actual cash value" is not in bold type face in the Policy; nor is it listed in the "General Definitions" section of the Policy. Policy 10, [DE 181-1]. *Cf. Gov't Emps. Ins. Co. v. Gordon*, 725 F. App'x 919, 921 (11th Cir. 2018) (noting that defined terms in the policy at issue were marked in bold and italics).

Even if the provision of the Policy specifying how ACV is determined, did equate to a definition of ACV under the Policy, Plaintiff's interpretation that ACV is equivalent to replacement costs less depreciation is still clearly reasonable considering that numerous Florida courts have equated actual cash value to market value and both terms to replacement costs less depreciation. *See Trinidad v. Fla. Peninsula Ins. Co.*, 121 So. 3d 433, 438 (Fla. 2013) ("actual cash value is generally defined as 'fair market value' or '[r]eplacement cost minus normal depreciation,' where depreciation is defined as a 'decline in an asset's value because of use, wear, obsolescence, or age.'"); *Goff v. State Farm Fla. Ins. Co.*, 999 So. 2d 684, 690 (Fla. 2nd DCA 2008); *Sos v. State Farm Mut. Auto. Ins. Co.*, 396 F. Supp. 3d 1074, 1080 (M.D. Fla. 2019). Accordingly, a Policy provision stating that ACV is determined by market value, age, and condition does not clearly and unambiguously limit ACV to an amount less than replacement costs less depreciation when both market value and ACV have regularly been interpreted to mean replacement costs less depreciation. Further, interpreting the ACV and "market value" as equivalent to replacement costs less depreciation is reasonable.

Defendants point to *Pieczonka v. Progressive Select Ins. Co.*, for the holding that for a policy where actual cash value is determined by considering the vehicle's "market value, age, and condition…at the time the loss occurs", title, registration, and license fees are not included in the ACV. It appears that the district court in *Pieczonka* did not fully consider that under Florida law, market value can be synonymous with replacement costs less depreciation rather than explicitly and alternative to it. *Pieczonka v. Progressive Select Ins. Co*, No. 19-CV-2965, 2020 WL 1930134, at *2 (N.D. Ohio Apr. 21, 2020), *aff'd sub nom. Pieczonka v. Progressive Select Ins. Co.*, 840 F. App'x 856 (6th Cir. 2021).[6] The Court in *Pieczonka* also stated that including

---

[6] The Sixth Circuit, in an unpublished opinion, also found that under the plain terms of a policy which states that the ACV "is determined by three factors at the time of the loss: market value, age, and condition", the market value

title, registration, and license fees in the ACV would negate any difference between a limit of liability providing for costs to replace a vehicle and the ACV for that vehicle. *Id.* This reasoning, however, ignores that the difference between the ACV and the replacement cost of a covered auto can be depreciation, which ACV takes into account, but replacement cost alone does not. *See Sos*, 396 F. Supp. 3d at 1080 (citing *Goff*, 999 So. 2d at 690. *See also Am. Reliance Ins. Co. v. Perez*, 689 So. 2d 290, 291 (Fla. 3rd DCA 1997) (reasoning that ACV includes a deduction for depreciation where replacement cost does not).

Considering the foregoing analysis, and the directive that ambiguous terms in insurance contracts should be liberally construed in favor of the insured, the Court finds that "actual cash value" under the Policy is equivalent to replacement costs minus depreciation. Reading ACV as meaning replacement cost less depreciation is consistent with the Policy provision stating that the ACV is measured by market value. This provision confirms that the Policy is determining ACV consistent with Florida common law, where ACV is "generally synonymous" with "market value" and takes into account depreciation. *See Goff*, 999 So. 2d at 689. Further, defining ACV, measured by "market value", as replacement costs less depreciation does not render the separate limit of liability of replacement costs redundant. *Sos*, 396 F. Supp. 3d at 1080 ("The court arrived at this definition by comparing actual cash value to replacement

---

"plainly does not include the costs that [the insured] claims should be covered because those fees are not paid to the seller." *See Pieczonka v. Progressive Select Ins. Co.*, 840 F. App'x 856, 857–58 (6th Cir. 2021) (reasoning that market value, is "[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction.") (citing *Black's Law Dictionary* (11th ed. 2019). The Sixth Circuit found that defining "market value" as "[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction" was consistent with Florida Law. *See Pieczonka v. Progressive Select Ins. Co.*, 840 F. App'x 856, 857 (6th Cir. 2021) (citing *Am. Reliance Ins. Co. v. Perez*, 689 So. 2d 290, 291 (Fla. 3rd DCA 1997)) The Sixth Circuit, however, did not consider that "fair market value" synonymous with "[r]eplacement cost minus normal depreciation," which multiple Florida courts have held. *See Trinidad v. Fla. Peninsula Ins. Co.*, 121 So. 3d 433, 438 (Fla. 2013) ("actual cash value is generally defined as 'fair market value' or '[r]eplacement cost minus normal depreciation,' where depreciation is defined as a 'decline in an asset's value because of use, wear, obsolescence, or age.'"); *Goff v. State Farm Fla. Ins. Co.*, 999 So. 2d 684, 689–90 (Fla. 2nd DCA 2008).

cost and explaining that the difference between the two terms is that actual cash value accounts for depreciation."). The key difference between the cost to replace a vehicle and the ACV of a vehicle is that actual cash value accounts for depreciation. *Id.*

### B. Components Included in Replacement Costs

As the Court has determined that "actual cash value" under the Policy is equivalent to replacement costs minus depreciation, the Court must determine whether such replacement costs include ACV Sales Tax and Transfer Fees.

Plaintiffs argue that "replacement cost" includes any cost reasonably necessary to replace the covered auto. The record evidence, according to Plaintiffs, establishes that two of these replacement costs are title and registration fees or what Plaintiffs refer to as Transfer Fees, equaling $79.85, and sales tax of 6% (plus applicable local surtax) of the underlying vehicle value, which Plaintiffs refer to as the ACV Sales Tax.

The relevant question in determining what charges are included in the replacement cost, as part of the ACV, is what costs the policyholder would be reasonably likely to need to incur in order to replace the covered auto. *Mills v. Foremost Ins. Co.*, 511 F.3d 1300, 1306 (11th Cir. 2008). In interpreting what charges were included in actual cash value defined as the "'cost to repair or replace'…less certain depreciation", the Eleventh Circuit reasoned that charges which the policyholder would be reasonably likely to need to incur in repairing or replacing the damaged property would be included. *Id.* at 1305–06. The Eleventh Circuit has also held that where a Policy does not condition payment on actual replacement of a covered auto, the costs included in the replacement cost would not be dependent on "whether the insured actually repairs or replaces the property." *Id.* at 1306.

Courts in Florida have routinely found that insureds are reasonably likely to need to incur sales tax and title transfer fees in replacing a vehicle, and, therefore, sales tax and title transfer fees are included in the replacement cost under similar insurance policies. *See e.g. Sos*, 396 F. Supp. 3d at 1081. In *Sos v. State Farm Mut. Auto. Ins. Co.*, the court reasoned that "Florida law imposes mandatory sales tax and title transfer fees for the replacement of all vehicles, whether leased or owned. Fla. Stat. § 212.05 (sales tax); § 319.34 (title transfer fee). As such, these taxes and fees are necessarily included in the replacement cost of a total loss vehicle." *Sos*, 396 F. Supp. 3d at 1080.

In addition to sales tax and title transfer fees, which courts in Florida have previously awarded, Plaintiffs seek a license plate or tag transfer fee, in the amount of $4.60, which Plaintiffs, and this Court, refer to as registration transfer fees.

Under Florida statute every "person in charge" of a motor vehicle that is driven on the roads in Florida must register the vehicle with the state. Fla. Stat. Ann. § 320.02. The "registration license plate and certificate of registration" is issued to, and remains in the name of the, the owner of a vehicle. Fla. Stat. § 320.0609. When the owner replaces the vehicle, the registration license plate cannot be affixed to the new vehicle without filing an application for transfer and paying a transfer fee. Florida Stat. § 320.0609.

Accordingly, the Court finds that sales tax, title transfer fees, and registration transfer fees are costs an insured is reasonably likely to need to incur in replacing his vehicle, and therefore are components of the ACV under the Policy.[7] *Sos*, 396 F. Supp. 3d at 1081. As such,

---

[7] Defendant's primary substantive argument in response to Plaintiffs' claim that title and registration transfer fees ("Transfer Fees") are reasonably likely to be incurred is that dealerships have a large latitude in negotiating lease agreements, including deciding whether Transfer Fees are passed onto the lessee. DRSMF ¶¶ 69, 70. As the Court further explains below, the Court finds that finds the Policy requires Defendants to calculate the actual cash value of total-loss, leased vehicles the same way it would for total-loss, owned vehicles. Accordingly, Defendant's argument is not relevant to whether Transfer Fees are required under the Policy.

Defendants breached the Policy by not paying Plaintiffs Transfer Fees and by not paying Plaintiffs Hegel and Hernandez full ACV Sales Tax.

### C. Damages

The final element of Plaintiff's breach of contract claim is damages. Defendants contend that Plaintiffs have failed to demonstrate that they were damaged by the breach because they have not established that they paid ACV Sales Tax or Transfer Fees that should have been but were not paid. The damage to Plaintiffs is the amount that Plaintiffs underpaid by Defendants compared to the amount owed to them under the Policy, which based the foregoing analysis here includes any unpaid sales tax up to 6% (plus applicable local surtax) of the underlying vehicle value and Transfer Fees totaling $75.25 for each Plaintiff.[8]

The Plaintiffs incurred these damages regardless of whether they owned or leased the covered autos. Defendants contend that sales tax and transfer fees are assessed differently for owned and leased vehicles in Florida, and, therefore, owned and leased insureds should not be paid in the same manner for a total loss claim. The Policy, however, does not distinguish between the ACV to be paid for an owned or a leased vehicle. Further, the Parties agreed at the hearing on this matter that Defendants charge the same premium regardless of whether the covered auto is owned or leased. As such, the Court finds that the Policy requires Defendants to calculate the ACV for total loss claims on leased vehicles in the same manner it would for total loss claims on owned vehicles. *Sos*, 396 F. Supp. 3d at 1081 (finding that because the policy in that case "[did] not distinguish between the actual cash value for owned or leased vehicles and provide[d] no notice to insureds that their leased vehicles [would] be valued differently based on

---

[8] The present is not a case where the Court finds Plaintiffs are seeking more than the actual cash value of the covered auto or where the Court has found that Plaintiffs were paid the full actual cash value. *Cf. Morgan v. Progressive Select Ins. Co.* No. 18-cv-61844-WPD [DE 196, p. 6] (S.D. Fla. Sept. 10, 2020) ("Defendant paid Plaintiff the actual cash value of the covered vehicle at the time of the loss….").

whether they were leased" the policy required the insurer "to treat its actual cash value payments for total loss claims on leased vehicles the same as it would for total loss claims on owned vehicles").

Plaintiffs argue that there are no genuine issues of material face as to the amount of damages in ACV Sales Tax and Transfer Fees each Plaintiff, and each class member has incurred. As to Transfer Fees, Plaintiffs assert that record evidence demonstrates damages in the amount of $79.85 for insureds. As to sales tax, Plaintiffs argue that record evidence demonstrates all class members are owed any unpaid sales tax up to 6% (plus applicable local surtax) of the underlying vehicle value.

### i. *Damages for Unpaid Sales Tax*

Every motor vehicle purchased in Florida is taxed at a 6% state sales tax rate plus applicable local taxes. Fla. Stat. § 212.05. A finding of a 6 % state sales tax rate plus applicable local taxes comports with the sales tax damages courts have found in similar cases. *Sos*, 396 F. Supp. 3d at 1081; *Roth v. GEICO Gen. Ins. Co.*, No. 16-62942-CIV, 2018 WL 3412852, at *5 (S.D. Fla. June 14, 2018), *vacated,* No. 16-62942-CIV-WPD, 2020 WL 5507208 (S.D. Fla. Aug. 27, 2020).

As to the individual Plaintiffs', the ACV Sales Tax evident in the record is $421.86 for Plaintiff Paris, $2054.06 for Plaintiff Hegel, and $2534.04 for Plaintiff Hernandez. *See* PSMF ¶¶ 43, 50, 61. Defendants paid Plaintiff Paris $421.86 in sales tax, Plaintiff Hegel $156.48 in sales tax, and paid $142.56 in sales tax in total loss settlement for the vehicle leased covered by Hernandez's insurance policy. PSMF ¶ 43, 49, 60. While Defendants dispute the finding that Plaintiffs were owed any more sales tax under the Policy or Florida law, Defendants do not dispute adjusted pre-tax values of the vehicles, which are supported by record evidence, *see* Exh.

K 2, [DE 181-10], Exh. L 2, [DE 181-11], Exh. M 2, [DE 181-12], nor the sales tax calculations, DRSMF ¶¶ 43, 49, 50, 60, 61. Accordingly, the Court finds that there is no genuine issue of material fact that Defendants breached the Policy by underpaying sales tax by $1,897.58 for Plaintiff Hegel and $2,391.48 for Plaintiff Hernandez.

    *ii.*    ***Damages for Unpaid Transfer Fees***

Plaintiffs' calculation of the Transfer Fees owed is made up of two sets of fees, title transfer fee totaling $75.25 and registration, or tag, transfer fees totaling $4.60.

Florida law imposes a title transfer fee totaling $75.25 for owned vehicles. Fla. Stat. § 319.32 (imposing a $70 fee for each original certificate of title or duplicate copy of a certificate of title, Fla. Stat. § 319.32(1), an additional $1 fee for materials used for security purposes, *Id.*, and a $4.25 transfer fee, Fla. Stat. § 319.32(2)(a)). This $75.25 fee comports with the damages request of Plaintiffs' and the damages courts have found in similar cases. *See Sos*, 396 F. Supp. 3d at 1081; *Roth v. GEICO Gen. Ins. Co.*, No. 16-62942-CIV, 2018 WL 3412852, at *5 (S.D. Fla. June 14, 2018), *vacated,* No. 16-62942-CIV-WPD, 2020 WL 5507208 (S.D. Fla. Aug. 27, 2020).

As to the registration transfer fee, Plaintiffs claim that there is no genuine issue of material fact regarding whether the registration transfer fee Plaintiffs would reasonably need to pay in replacing their vehicles was $4.60. Plaintiffs rely on the report of their expert Karen Matera, who states that "[t]he minimum mandatory tag transfer fees includes the following mandatory components: Branch fee of $.50, EMS fee of $.10, the Florida Real-Time Vehicle Information System (FRVIS) fee of $.50, service fee of $2.50, and Air Pollution Control fee of $1.00 for total mandatory tag transfer fees of $4.60." Matera Report 11, [DE 181-17].[9]

---

[9] The Court notes that while, Plaintiffs' expert, Matera, does not specifically cite to Florida law and reports based on her experience with tag transfer fees, Matera's calculation is largely supported by Florida law. A Branch fee of $.50

Defendants raise a number of issues with the report of Plaintiff's expert Karen Matera and Plaintiffs' reliance on it in summary judgment.[10] Defendants argue that Matera's conclusions are interpretations of Florida law, on which she cannot properly opine. In addition, Defendants argue that the Matera Report is an unsworn document that is not properly authenticated and should not be considered.

The Court agrees with Defendants that the amount of the minimum registration, or tag, fee is a question of interpretation of Florida law. Florida law states that, when the owner replaces a vehicle, the registration license plate cannot be affixed to the new vehicle without filing an application for transfer and paying a transfer fee of $4.50. Fla. Stat. § 320.0609(2)(a). *See also* Fla. Stat. Ann. § 320.0609(5)(a)("If the replacement motor vehicle requires the same amount of license tax under s. 320.08 as the original vehicle to be replaced, no additional tax other than the transfer fee of $4.50, accompanied by an application for transfer on a form supplied by the department, is required to transfer or exchange a registration license plate for use on a replacement vehicle for the duration of a current registration period and to issue a new certificate of registration."). Accordingly, the Court finds that the amount of registration transfer fees Plaintiffs are reasonably likely to need to incur under Florida law is $4.50.

Accordingly, the Court finds that there is no genuine issue of material fact that Defendants breached the Policy by $79.75.

D. **Prejudgment Interest**

---

is noted in §Fla. Stat. Ann. § 320.04, a Florida Real-Time Vehicle Information System fee of $.50 is noted in §320.03(5)(a), a service fee of $2.50 is noted in §320.04(1)(a), and an Air Pollution Control fee of $1.00 is noted in §320.03(6)). Matera also claims that an EMS fee of $.10 is part of the minimum mandator tag transfer fee. The EMS fee is articulated in Fla. Stat. § 320.0801; Section 320.0801, however, states that the "tax shall be paid to the department or its agent upon the registration or renewal of registration of the vehicle" not upon the transfer of a vehicle.

[10] Defendants also take issue with the timeliness of Matera's report; however, the Court notes that Judge Snow found that Matera's report was timely and denied Defendant's motion to strike Matera's expert report.

"[I]t has long been the law in Florida that in contract actions, and in certain tort cases, once the amount of damages is determined, prejudgment interest is allowed from the date of the loss or the accrual of cause of action." *Bosem v. Musa Holdings, Inc.*, 46 So. 3d 42, 46 (Fla. 2010). The Court has found that Defendants breached the Policy by failing to pay full sales tax and title and tag transfer fees when settling Plaintiffs' total loss claims. Plaintiffs were damaged when the amount they were paid was less than the what they were owed under the contract. Accordingly, Plaintiffs are entitled to prejudgment interest.

## IV. CONCLUSION

Based on the foregoing analysis the Court finds that Plaintiffs' have demonstrated that sales tax, title transfer fees, and registration transfer fees are included in the actual cash value of Plaintiffs' (and the class members') total loss vehicles under the Policy. Accordingly, Progressive's failure to pay total loss insureds sale tax in the amount of 6% of the value of the covered auto (plus any local surtaxes) and transfer fees in the amount of $79.75 when settling those claims based on the actual cash value of the covered auto constituted a breach of contract.

For the foregoing reasons, it is **ORDERED AND ADJUDGED** as follows:

1. Plaintiffs' for Summary Judgment [DE 175] is **GRANTED;**
2. Defendants' Motion for Summary Judgment [DE 171] is **DENIED**;
3. Plaintiffs are entitled to damages for any unpaid sales tax in the amount of 6% plus local surtax of the adjusted vehicle value of each plaintiffs' total loss vehicle; and for unpaid title and tag transfer fees in the amount of $79.75.
4. Class members are entitled to damages in the amount of 6% of the adjusted vehicle value of each member's total loss vehicle (plus any applicable local taxes); and the amount of $79.75 in title and tag transfer fees.

5. The Parties shall file a proposed schedule for calculating damages in this matter, any motions for attorney's fees, and filing a proposed final judgment on or before September 10, 2021.

6. The Court will refer the matter to Magistrate Judge Becerra to oversee the process of calculating the damages in accordance with this Order.

7. The Clerk is directed to **ADMINISTRATIVELY CLOSE** this case and **DENY as moot** all pending motions.

**DONE AND ORDERED** in Chambers in Fort Lauderdale, Broward County, Florida this 27th day of August, 2021.

WILLIAM P. DIMITROULEAS
United States District Judge

Copies furnished to:

All Counsel of Record